STATE v. POOL.

(SEE 74 N. C. REP., 402.)

Justices READE and RODMAN dissenting from the opinion
of the majority of the Court in this case, which was reported,
74 N. C. Rep., 402, and before the dissenting opinion of
Judge RODMAN was received, it is now published as part of
that case, 74 N. C. Rep., 402.

RODMAN, J., dissenting. It is, and as I am informed has
been for many years, understood among the Justices of this
Court that every dissenting opinion must be filed at the
same term at which the judgment is rendered. The custom
is a good one, and I would not depart from it without the
consent of the Associates from whom I differ, nor then ex-
cept when by reason that the opinion of the majority was
ascertained and delivered very shortly before the adjourn-
ment, no time was left for the dissenting Justices to put their
views in writing.

The present case derives its chief importance, in my opin-
ion, by reason of its belonging to a class of cases respecting
the rights of persons dwelling, or owning lands, on or near
streams not technically navigable, as being within the ebb
and flow of the tide, or navigable in the sense of permitting
the access of sea going vessels, or even available at all sea-
sons for navigation by canoes, or for the floating of logs, &c.,
but which at the seasons of the usual rains are so available
and are at all times available and necessary for the proper
drainage of the country whose surface water naturally flows
into them. This species of rights has acquired new impor-
tance recently, by reason of the enterprise which in several
parts of the State is being directed to the improvement of

lands which lie on the banks or at the heads of such non-navigable water courses. To a person proposing to himself the improvement of a piece of land so situated, it is an indispensable inquiry what facilities, or what obstructions does the law of the State present. The law as applicable to the many cases which may arise cannot be considered settled, and its final settlement on just principles requires a full discussion.

A case decided by this Court is settled between the parties, but it can never be deemed satisfactorily decided until it is brought under some general and acknowledged rule of equity. When this is once done with reasonable certainty the case is settled forever ; it becomes an authority and passes into the text books as a valuable illustration or gratification of the rule.

To come to the case in hand :

I connot believe that the Legislature, in the act under consideration, inadvertently used the word " or " instead of " and." doubtless, in construing a statute you may suppose such an error sometimes. But this is legitimate only when the act, being read as it is written, has no meaning or an unreasonable and absurd one. A Court has no right to alter a word in an act of Assembly which as it stands gives to the sentence a sensible meaning, because the Court may think that the act with that meaning would be unnecessary or inexpedient. To do that is to legislate.

In the act the words forming the first clause of the sentence are these, " If any person shall wilfully fell any tree, or wilfully put any obstruction except, &c., in any branch, creek or other natural passage for water, whereby the natural flow of water through such passage is lessened or retarded, *or*, &c., the person so offending shall be guilty of a misdemeanor," &c.

The meaning is sensible and clear without any change in the words. And it is neither unreasonable or absurd. The

act merely generalizes, and applies to all the creeks, &c., in the State, a provision which had been previously enacted by special acts as to very many creeks, &c. These acts begin at an early period and continue to the date of the act in question. At the single session of 1868–'9 six acts were passed to forbid obstructing certain named· water courses, none of which are navigable, and five of these acts made the obstructing a misdemeanor, (chaps. 24, 44, 60, 68, 106, 206). Nor are these acts confined to water courses in the lower part of the State. They relate to the Catawba, Mitchell, Yadkin Uwharrie rivers, as well as to Rockfish creek, Little River and Contentnea creeks.

A search throughout statutes, I am confident, would show several hundred acts of a similar character since 1715. The very long possession of such acts forbids the belief that their constitutionality was ever questioned or suspected either in the Legislature or in the Courts until recently. I refer to the great number of these acts to show that the provision in the act of 1872–'3 was not such a novelty as to require us to read the act otherwise than it is printed in order to give it a sensible meaning; and also to show that in the opinion of many respectable men, such a provision was not absurd or inexpedient.

In my opinion, it is no argument against the power of the Legislature to pass the act, that it would be inexpedient or absurd if applied to a certain class of mountain streams which are properly torrents. The meaning of the act does not include such streams as my learned brother refers to in the opinion of the Court. The construction made penal is one whereby the natural flow of the water is lessened or retarded. By any fair construction this means *sensibly and permanently* lessened or retarded, so lessened or retarded as sensibly to damage the public or individuals by reason of it. Any other construction would be obnoxious to the maxim, " *de ninimis lex non cureat.*" These mountain streams which

are utilized to wash gold deposits, &c., are incapable of being sensibly and permanently retarded to the damage of any one. They burst away, or rise over, or rush around the obstruction, and do not stagnate behind it. It is otherwise with the water courses to which the act does apply.

Few of these below the falls of the rivers have a fall of more than a foot to the mile in times of low water. A slight obstruction catches and detains the leaves and branches and trunks of trees as they float slowly down. These catch the earth, and soon a compact dam is formed, which stagnates the water when it is low, so as to produce disease; and retards it when it is high, so as to forbid drainage. An obstruction or a series of obstructions which raises the water one foot damages more or less of the land above for miles depending upon the amount of fall and other circumstances. The navigation by canoes and floating of timber, of which nearly all these water-courses in their natural condition are susceptible, is prevented.

To obstruct the natural flow of water so as to injure the public health is a nuisance at common law.

To obstruct a water-course so that the public cannot travel it in canoes is as much a public nuisance at common law as the obstruction of a highway on land, for a water-course is a highway *jure natural.* 13 Rep., 33 ; Noy. Rep., 103 ; 3 Kent Com. (11th ed.) 412, 428, 439; *Hendricks* v. *Johnson,* 6 Port. (Ala.) 472; *Davis* v. *Fuller,* 12 Vt., 178. To obstruct a natural water course so as to render impossible or more difficult the drainage of the adjoining lands though the obstruction does not certainly or sensibly injure the public health, and although the water-course in its natural condition was not susceptible of any sort of navigation, may or may not be an indictable offence at common law. In my opinion, on common law maxims it is, but I have found no direct authority to that effect, unless it be the cases cited from the Year Books and other old authorities in Woolryck

on Waters, 177. But it seems to be everywhere assumed. 3 Kent Com., (11th ed.) 439.

But that the Legislature may declare any and every obstruction to the natural flow of water, whereby an injury of either of these classes is caused, a criminal offence, without proof that the public health was in fact injured by it— about which doctors will always dispute in any given case— and without proof that any particular traveller was prevented from passing in his canoe, and without proof that any particular land was rendered more difficult of drainage, I can not doubt. From an act which is always or generally accompanied by drainage, the statute may make a presumption that drainage followed, and dispense with proof of it, just as on an indictment for obstructing a highway on land, it is unnecessary to prove that any particular traveller was impeded. The police power of a State, as is said by Cooley (Const. Lim., chap. 16,) includes the power to make all regulations necessary to promote the public health, welfare and convenience. If this power does not include a power to make penal the obstruction of a water course which is, at the least, likely seriously to injure public and private interests, then the State is denied the most beneficial power of sovereignty, and must sink into insignificance and contempt.

Neither is it any fair argument against the constitutionality of this Act, to say that under it persons could be punished for *diverting* water courses on their own lands for domestic or other useful purposes. The diversion of a stream is a different thing from sensibly and permanently retarding its course. The law respecting such an use of it by riparian proprietors is well understood, and may be found in the text books. The present Act has no bearing whatever on such rights.

But it is said the bed of Swift creek is private property, and the Legislature cannot appropriate it to public use without compensation. Admit that the bed of the creek at

the point where the obstruction was placed was the private property of the defendant, as *in a qualified sense* it was. He did not thereby have the right to erect on it either what was a nuisance at common law or what the Legislature had declared to be one. The ownership of all property is subject to the maxim, " *sic uteræ tur uto alimum non∬lædas.*" The Act does not attempt to appropriate the land of the defendant to a public or private use. It prohibits him from no legitimate use of it. It is not a law special to him. It embraces the whole people, and says of all owners of the beds of such streams, You shall not so use your property as to injure the public or your neighbors.

It seems to be supposed that because the grant to the predecessor of the defendant by its calls passed across the creek and included its bed, the defendant thereby acquired a title to the bed, if not quite superior to the maxim I have cited, is at least superior to and free from the right of the public and of other riparian proprietors to have the water flow without obstruction in its natural course, and superior even to the police power of the State.

For this proposition the cases of *State* v. *Glenn,* 7 Jones, 321, and *Cornelius* v. *Glenn,* id., 512, are cited. Whether those cases can be sustained on any grounds, I do not propose to inquire ; but in my opinion they cannot be sustained on the grounds stated by the learned Judge who delivered the opinion of the Court in the first of those cases, and which are repeated in the second. The learned Judge admits that if the State grants land bounded on one side by a non-navigable stream, the grantee, by construction of law, acquires a title to the bed of the stream to its middle thread, subject to a public easement and to certain private rights. So if by another grant on the opposite side of the stream, he acquires a title from that side to the middle thread, he thus by construction of law, acquires a title to the whole bed, subject as aforesaid.

Of such proprietor he says, on page 326 : " As the riparian proprietor of the land on both sides of the stream, he is clearly entitled to the soil entirely across the river, subject to an easement in the public," &c.

This just and admitted doctrine is derived from Lord Hale, whose treatise is the foundation of the law of Waters. It is affirmed in very numerous cases.

The opinion then proceeds :. "But he (the defendant Glenn) is much more than a riparian owner. He claims under a direct grant from the State for the bed of the river, in which the State, for what she deemed a fair equivalent, conferred on those from whom he derives title, *the full* ownership of the soil, *without any reservation whatever*, except the right to impose such imposts and taxes as may be necessary for the support of the government."

The only authority cited for this distinction is, *The People* v. *Platt*, 17 Johns., 195. On an examination of that case it will be found to give it no support. The defendant was in 1818 indicted for a nuisance, in that he kept up a dam across the mouth of Saranoe river, which empties into Lake Champlain, and thereby obstructed the passage of salmon from the lake to the river. And a second count charged that he kept up said dam, without having constructed a slope for the upward passage of salmon, as required by two statutes passed in 1801. The defendants acquired title to the land at the mouth of the river on both sides, and for seven miles up the river, by a grant dated in 1784.

The grantee created a dam across the mouth of the river in 1780, and had continually maintained it up to the date of the indictment, a period of over thirty years. The river was not navigable for any sort of boats, and salmon could not ascend the stream much if any higher than the defendant's upper boundary, below which he had the exclusive right of fishing. Thus it will be seen that Platt's right to maintain his dam and obstruct the river did not depend,

and was not put by the Court (although some expressions in the opinion may seem to have that meaning), solely or mainly on the ground that his grant covered the bed of the river, but on the perfectly tenable ground that from such long enjoyment a special grant would be presumed to erect and maintain the dam, after which it would clearly be beyond the power of the State to compel its destruction without compensation. This doctrine no one will dispute. It was competent to the State of New York to grant to Platt the right to erect a dam across a river unnavigable in any sense, and by presumption of law it did so. It was equally competent to this State to have granted to Glenn by a special grant, authorized by Act of Assembly, a similar right. But the difference between the two cases is, that there was no evidence that this State had ever made such a grant. There was no law to authorize a special grant, and if the Secretary of State had undertaken to sign one it would have been void. After some search I have not found in any text book or decision an approval of the distinction taken by the learned Judge, in *The State* v. *Glenn;* nor have I found anywhere else such an interpretation put on the case of *The People* v. *Platt,* and it is incredible that if Kent had thought that such a doctrine had been held in that case he would have omitted all notice of it when treating of the rights over water at the places referred to. The distinction is not attempted to be supported by any reason except that the State had received from Glenn, *what she deemed a fair equivalent.* I will deal with this question presently.

In my opinion, the distinction is not sustained by reason, and is opposed to common right and to the received principles of the common law. Whether the bed of a stream be embraced in a grant by construction of law, or passes to the grantee because it is included by the calls of the grant, is immaterial. The land passes in either case, subject to the public easement, and to the rights of other riparian proprie-

tors, and subject, as all property in the State must be, to its unalienable police power. *Lewis* v. *Stein*, 16 Ala. Rep.

Now, let us consider whether the distinction has any foundation in reason, and is consistent with admitted principles of law.

It is a familiar rule that grants from the State—differing in this respect from grants from individuals—are construed most favorably for the State. Nothing passes by implication or except by express words.

The form and words of all grants for lands by the State is the same. When by its calls a grant includes land over which a stream flows, there need be nothing in the grant to show that it is for land so situated, and there are no words in the grant different from those ordinarily used, or professing to convey any peculiar rights or privileges.

The Secretary of State has no discretion in issuing grants if the legal conditions, which are the same for all grants, are complied with. The price per acre is the same for all lands whether covered by flowing water or not. The State is paid only for the land granted, and receives no consideration for its supposed grant of a most valuable public easement, and for its destruction of the rights of all upper riparian proprietors. In fact it may be doubted whether the State could rightfully make a grant in derogation of their rights as such proprietors under previous grants. The proposition that the State made a special grant to Glenn of special rights is unsupported by anything in his case, and the like supposition is unsupported in the present case.

It is not stated how far above or below the obstruction the ownership of the evil by the defendant extends. It may be for a very short distance only. If it be beyond the power of the Legislature to make the obstruction of such a stream as this an offence, it follows that no action can be maintained by reason of it. Being a rightful act and a legitimate exercise of the right of ownership of the soil, it is *damnum abs-*

*que injuria.* All others similarly situated above and *below* the defendant may erect like obstructions. The result would be to prevent entirely the flow of the stream in ordinary seasons, and thus reduce a very large quantity of the most fertile land in the State to the condition of a morass—which the law says shall never be reclaimed as long as the trivial and selfish interests of one man forbid it.

I think the judgment should be affirmed.

Two other cases, owing to the not receiving the necessary diagrams, are transferred to the LXXVIth Volume.